UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-CR-20204-RAR

UNITED STATES OF AMERICA

v.

**DEMETRIS KEWAN MACKIE**,

    Defendant.
_____/

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

This matter involves the propriety, under the Fourth Amendment to the United States Constitution, of two actions by law enforcement to locate and arrest Defendant Demetris Kewan Mackie. The first issue concerns law enforcement's reliance on a cell-site warrant to locate Defendant. The second issue concerns the search of Defendant incident to his arrest.

Defendant filed a Motion to Suppress Phone Records and Physical Evidence, [ECF No. 40], on September 28, 2023. On October 2, 2023, the Government filed its Response in Opposition, [ECF No. 48]. On October 3, 2023, the Court held a Calendar Call during which counsel for the Government and the Defendant clarified certain aspects of their positions on the Motion. [ECF No. 49]. Having carefully reviewed and considered the Motion, Response, and counsels' statements at Calendar Call, it is hereby

**ORDERED AND ADJUDGED** that Defendant's Motion to Suppress Phone Records and Physical Evidence, [ECF No. 40], is **DENIED** as set forth herein.

## BACKGROUND

The following factual background is derived from the Motion, the Response, and the Government's Motion in Limine, [ECF No. 35], filed on September 24, 2023, which the Government incorporated by reference in its Response. *See* Resp. at 2. A full recounting of the

complete factual background is unnecessary to decide the instant Motion. Accordingly, the Court assumes the parties' familiarity with the relevant facts and focuses only on those necessary to resolve the Motion.

This case involves the investigation of two shootings on April 12 and April 15, 2023. Mot. at 1; [ECF No. 35] at 2. The first shooting occurred on the night of April 12, after which law enforcement began looking for the perpetrator. Resp. at 2. The Government includes, as part of its Response, still-frames from a surveillance video purportedly captured the night of the April 12 shooting that depict the Defendant. *Id.* at 2–3. The Government also contends that on the same night, law enforcement "interviewed three witnesses: the man that . . . [was] shot (the 'Victim'), another man who was at the scene and familiar with the people involved in the dispute (the 'Witness'), and someone who was near the scene but claimed to be inside a nearby building at the time of the shooting (the 'Bystander')." *Id.* at 2. According to the Government, the Bystander had no useful information, and the Victim gave a specific description of his assailant, including his distinctive facial tattoos, but did not know his name. *Id*. The Witness, on the other hand, was apparently more helpful. *Id*. at 3.

Indeed, the Government claims that on the night of April 12, law enforcement conducted a recorded interview during which the Witness was initially uncooperative other than acknowledging his involvement in the dispute that led to the shooting and stating that he had seen the shooter in the area. *Id*. But after the recorded interview ended, the Witness allegedly became more cooperative. *Id*. According to the Government, the Witness eventually admitted that he could identify the shooter on social media, having seen photos of the shooter online before. *Id*. The Witness then showed officers a photo of the man he believed to be the shooter and whom law enforcement believed to be the Defendant. *Id*. Next, law enforcement showed the Witness a DAVID photo of the Defendant, [ECF No. 48-1], whom the Witness again identified as the

Defendant. Resp. at 3. Finally, the Witness also offered that "the Defendant had contacted him from a certain cell phone number (the 'Phone Number') to ask about the investigation," and after the Witness provided the Phone Number, "law enforcement used an investigatory database to determine that the Defendant's WhatsApp account was tied to the same phone." *Id*. Believing the Defendant to be armed and dangerous, law enforcement attempted, unsuccessfully, to find the Defendant in the ensuing days. *Id*. at 3–4. Ultimately, a bench warrant was issued for Defendant's arrest, [ECF No. 48-2]. *See* Resp. at 4.

In furtherance of its investigation and based on the information provided by the Witness, law enforcement proceeded to apply for a warrant from the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, [ECF No. 48-3] at 1–9, to search T-Mobile's cell-site data related to the Phone Number's historical and real-time cell-site information, as well as authorization to use a cell-site simulator. The application requested only 18 days of data beginning on April 1, 2023, [ECF No. 48-3] at 5, and was based on the facts recited in an attached affidavit from law enforcement, [ECF No. 48-3] at 20–21. The application recounted the Witness's identification of the Defendant, his sharing of the Phone Number with law enforcement, and the fact the Witness claimed that Defendant had used the Phone Number to contact him after the shooting. [ECF No. 48-3] at 21. The application also cited law enforcement's independent reliance upon a crime center database, which was used to link the Defendant's WhatsApp number to the Defendant and the Phone Number. *Id*.

Based on these representations, a circuit court judge of the Eleventh Judicial Circuit issued the Warrant on April 18, 2023. [ECF No. 48-3] at 11–19. The Warrant authorized two-line items for search: (1) "[r]adio signals emitted by the target cellular telephone for the purpose of communicating with cellular infrastructure" and (2) "[r]adio signals emitted by the target cellular telephone in response to signals sent to the target cellular telephone by agents of Miami-Dade

Police Department." *Id*. at 16.  The Warrant then contained two-line items expressly limiting the scope of the search, providing that the Warrant "does not authorize the interception of the contents of any telephone calls, text messages, Internet data, or other electronic communications" and that "law enforcement shall conduct all operations to ensure the minimal amount of interference to non-target cellular devices" while also providing for the deletion of any information obtained from devices other than the Phone Number's assigned telephone. *Id*. at 16–17.  The Warrant's line items also concluded by noting that its grant of authority was intended to comply with Florida law relating to pen registers. *Id*. at 17.

On April 20, 2023, using the information that the Government was authorized to collect based on the Warrant, law enforcement tracked the Defendant to a restaurant on Ocean Drive in Miami Beach, where they arrested him on the premises.  Mot. at 4; Resp. at 5.  Both the Defendant and the Government agree that the Defendant was wearing a bag at the time of his arrest, referred to alternatively as a "green satchel style bag" by the Defendant, *see, e.g.*, Mot. at 4, and as a "crossbody bag" by the Government, *see, e.g.*, Resp. at 5–6.  At the time of Defendant's arrest, the Government maintains that "an officer removed the crossbody bag and felt an object that appeared to be a firearm," and "[a] search of the bag incident to arrest revealed a gun within." Resp. at 6. Defendant, on the other hand, claims that at the moment of arrest, "a green satchel style bag was taken from [the Defendant's] person (defendant did not consent to the taking) and searched without any additional warrants (defendant did not consent to the search) where from [sic] a telephone, a firearm and small packages of marijuana were seized."  Mot. at 4 (alterations added).

Defendant now seeks to (1) suppress the telephone data recovered from his cellular phone pursuant to the Warrant, which allowed law enforcement to locate and arrest him; (2) suppress the contents of his bag searched incident to arrest, namely, a firearm, small packages of marijuana, and the cellular phone law enforcement tracked to find and arrest him; and (3) *voir dire* the Witness

Page 4 of 15

that law enforcement relied upon to secure the Warrant leading to Defendant's arrest. *See* Mot. at 4–10.

## LEGAL STANDARD

The Fourth Amendment guarantees, among other things, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. But the Amendment is "not, of course, a guarantee against *all* searches and seizures." *United States v. Sharpe*, 470 U.S. 675, 682 (1985) (emphasis in original). Rather, it protects "only against *unreasonable* searches and seizures." *Id*. (emphasis in original). As a result, the propriety of a search or seizure turns on whether it was reasonable, and whether a search or seizure is reasonable "depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985). In evaluating these circumstances, the Supreme Court has stressed that "the ultimate touchstone . . . is reasonableness" and that "[t]o be reasonable is not to be perfect." *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (citations omitted).

Searches that violate the Fourth Amendment may result in the suppression of evidence recovered as a result of the search. *See United States v. Jordan*, 635 F.3d 1181, 1185 (11th Cir. 2011). Nonetheless, the Eleventh Circuit has noted that "[s]earches 'conducted pursuant to warrants will rarely require suppression.'" *United States v. Shelton*, No. 21-14362, 2022 WL 16002202, at *4 (11th Cir. Oct. 28, 2022) (quoting *United States v. Taxacher*, 902 F.2d 867, 871 (11th Cir. 1990)). Indeed, the Supreme Court has stressed that this so-called exclusionary rule is "judicially created" and that suppressing evidence is in general an "extreme sanction." *Herring v. United States*, 555 U.S. 135, 139–40 (2009) (citation omitted). The Eleventh Circuit has similarly emphasized that "the exclusionary rule is a judicially created means of deterring illegal searches and seizures" and the decision to suppress "is 'prudential rather than constitutionally mandated'

[and] is 'applicable only where its deterrence benefits outweigh its substantial social costs.'" *United States v. Campbell*, 26 F.4th 860, 878 (11th Cir. 2022) (en banc) (quoting *Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 363 (1998) (citation omitted). That social cost "require[s] that courts 'ignore reliable, trustworthy evidence bearing on guilt or innocence' [and] exact[s] a 'heavy toll on both the judicial system and society at large.'" *Id.* (quoting *Davis v. United States*, 564 U.S. 229, 237 (2011)).

## ANALYSIS

### I. The Cell-Site Warrant

The Defendant first asks the Court to suppress "the telephone data from the pen register with enhanced caller identification, trap and trace device, and GPS location information records," arguing that the Warrant used to collect this information was issued without probable cause. Mot. at 6. Defendant's argument as to the Warrant fails.

Warrants authorized by an independent judicial officer generally have the presumption of validity. *See United States v. Leon*, 468 U.S. 897, 914 (1984) ("[W]e have thus concluded that the preference for warrants is most appropriately effectuated by according great deference to a magistrate's determination.") (internal quotations and citation omitted). Accordingly, "[a]n affidavit supporting a search warrant is presumed valid." *United States v. Whyte*, 928 F.3d 1317, 1333 (11th Cir. 2019) (citation omitted). "To obtain suppression of evidence discovered pursuant to a warrant, a defendant must overcome that presumption by proving that the affiant made misrepresentations or omissions deliberately or with reckless disregard for the truth and that the affiant's misrepresentations or omissions materially affected the probable-cause determination." *Id.* (citations omitted). As a result, "intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause." *United States v. Kapordelis*, 569 F.3d 1291, 1309 (11th Cir. 2009).

A common type of warrant often relied upon to place a suspect at the scene of a crime is known as a "cell-site warrant," which is a type of search warrant that seeks location information relating to a suspect's cellular phone. "Cell-site location information is the record created every time a cell phone transmits or receives data through a cell tower." *United States v. Trader*, 981 F.3d 961, 967 (11th Cir. 2020). That information can provide circumstantial evidence as to a suspect's presence at a crime scene to an increasingly high degree of accuracy; indeed, "[m]any cell sites can 'pinpoint a phone's location within 50 meters.'" *Id*. (quoting *Carpenter v. United States*, 138 S. Ct. 2206, 2219 (2018)). "And cell phone users do not share their cell-site location information voluntarily: Carrying a cell phone is 'indispensable to participation in modern society,' cell phones generate cell-site location information 'without any affirmative act on the part of the user,' and users have no way to stop data collection other than making the phone useless by disconnecting it from the network." *Id*. (quoting *Carpenter*, 138 S. Ct. at 2220).

Accordingly, the Supreme Court has made clear that the Government needs a warrant to secure seven or more days of historical cell site information, *see Carpenter*, 138 S. Ct. at 2217 n.3. Of course, the Fourth Amendment nonetheless requires that "no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. And "[p]robable cause to support a search warrant exists when the totality of the circumstances allows the conclusion that there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Kapordelis*, 569 F.3d at 1310 (quotation and citation omitted). "'Fair probability' is determined by whether the facts and circumstances would lead a reasonably prudent person to believe the place to be searched contains evidence of a crime." *United States v. Barron-Soto*, 820 F.3d 409, 416 (11th Cir. 2016) (citation omitted).

Here, the Warrant issued by the circuit court judge was supported by probable cause, and the search it authorized was appropriately limited to the specific needs of law enforcement as set

out in the Warrant application and its accompanying affidavit, [ECF No. 48-3] at 1–9; 20–21. The affidavit adequately specified the facts needed to establish probable cause and explained that the cell-site information sought would further law enforcement's investigation of the April 12 shooting by assisting in locating additional information and/or physical evidence in furtherance of the investigation. Specifically, the affidavit included information and details provided by the Witness, which included the identification of the Defendant as the possible perpetrator of the shooting and noted that the Defendant had contacted him shortly after the shooting from the Phone Number the Witness provided to law enforcement. [ECF No. 48-3] at 21. The affidavit also included information concerning law enforcement's independent corroboration using its own database to connect the Defendant's WhatsApp number to the Phone Number provided by the Witness. *Id*.

These facts were sufficient for the circuit court judge to determine there was a "fair probability" that the cell-site information sought would further law enforcement's investigation, *Barron-Soto*, 820 F.3d at 416, and thus, that there was probable cause to issue the cell-site warrant. *Kapordelis*, 569 F.3d at 1310. Law enforcement had developed a strong lead for the perpetrator of the shooting based on (1) eyewitness accounts; (2) the surveillance video; (3) the Phone Number information supplied by the Witness; (4) the Witness's accompanying statement to law enforcement that the Defendant had called shortly after the shooting to ask whether law enforcement was investigating; and finally, (5) law enforcement's independent effort connecting the Phone Number to the Defendant's WhatsApp number. Based on these sworn facts, cell-site information was a reasonable and logical investigatory next step because it was likely to shed light on the Defendant's location at the time of the shooting, *see Trader*, 981 F.3d at 967, and to assist law enforcement in finding the shooter, whom law enforcement reasonably believed to be at large and posing an ongoing danger to society, *see United States v. Hammond*, 996 F.3d 374, 389–92 (7th Cir. 2021).

While it is true, as the Government notes, that there is little on-point, published post-*Carpenter* precedent, the Ninth Circuit's decision in *United States v. Artis* nonetheless provides a persuasive framework for courts examining such cell-site warrants. In *Artis*, as here, a defendant moved to suppress a cell-site warrant secured to aid law enforcement in searching for the defendant as a fugitive. 919 F.3d 1123, 1134 (9th Cir. 2019). The *Artis* court held that "[t]he warrant application therefore needed to establish probable cause to believe two things: that [the defendant] was in fact a fugitive, and that he was currently using the targeted cell phone." 919 F.3d at 1134. In concluding that probable cause existed to support the cell-site warrant at issue, the *Artis* court emphasized that an informant's tip disclosing the defendant's phone number to law enforcement was corroborated by the fact that law enforcement also discovered, independently, that someone using that same number had attempted to contact the other named co-defendant and one of the defendant's known associates. *Id*. at 1134–35.

The same is true of the cell-site warrant at issue here. The information that law enforcement gathered at the shooting scene generated probable cause to believe that the Defendant was the perpetrator and now a fugitive given the details provided by the Witness. And additional independent investigation by law enforcement connected the Defendant's WhatsApp number to the Phone Number and to the Defendant. Therefore, the affidavit submitted with the Warrant application set forth sufficient facts for the circuit court judge to conclude there was probable cause that the Defendant was the shooter. *See, e.g., Rankin v. Evans*, 133 F.3d 1425, 1441 (11th Cir. 1998) ("[A]n officer is entitled to rely on a victim's criminal complaint as support for probable cause."); *L.S.T., Inc. v. Crow*, 49 F.3d 679, 684–85 (11th Cir. 1995) (finding probable cause based on the "victim's complaint and his identification" with other eyewitnesses' statements); *Foreman v. City of Port St. Lucie,* 294 F. App'x 554, 557 (11th Cir. 2008) ("Probable cause for an arrest exists when an eyewitness reports witnessing a crime to police.").

The Warrant was also narrowly tailored to balance the Defendant's privacy interest in his location information with law enforcement's need to investigate the shooting. The Warrant authorized only 18 days of historical analysis, a period sufficiently long to reveal to law enforcement the Defendant's recent whereabouts without unduly infringing on his privacy interests. And the Warrant's authorization of a cell-site simulator to help law enforcement locate the Defendant was similarly narrowly tailored—it was designed to locate a suspect considered armed and dangerous based on the information known to law enforcement at the time.

### A. The Good Faith Exception

Notably, even if the warrant somehow lacked probable cause, the good faith exception to the exclusionary rule would still protect law enforcement's reliance upon the data secured by the Warrant to locate and arrest the Defendant. "One exception to [the] exclusionary rule is the *Leon* good faith exception." *United States v. Martin*, 297 F.3d 1308, 1312 (11th Cir. 2002) (alterations added). As explained by the Eleventh Circuit, *Leon* "stands for the principle that courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause." *Id.* at 1313.

The good faith exception "applies in all but four limited sets of circumstances: (1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role; (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Id.* (quoting *Leon*, 468 U.S. at 923) (cleaned up). Thus, the good faith exception "requires suppression

'only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.'" *Id*. (quoting *Leon*, 468 U.S. at 926). Accordingly, the good faith exception ensures that the "exclusionary rule's 'extreme sanction' is limited." *United States v. Mitchell*, No. 22-12084, 2023 WL 3620913, at *3 (11th Cir. May 24, 2023) (quoting *Herring*, 555 U.S. at 139–40); *see also Taxacher*, 902 F.2d at 871 (explaining that the exclusionary rule should not be applied "when officers engage in 'objectively reasonable law enforcement activity.'") (quoting *Leon*, 468 U.S. at 918–19).

Here, even if the Court were to determine that probable cause to issue the Warrant was lacking, law enforcement was nevertheless relying, in good faith, upon a search warrant that would not fall prey to any of the four *Leon* exceptions. Defendant does not argue that the issuing judge "was misled" by information in the affidavit "that the affiant knew was false" or "would have known was false except for his reckless disregard of the truth" or that the judge "abandon[ed] his or her judicial role," or that the Warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," or that the Warrant was facially deficient. *Martin*, 297 F.3d at 1313. And while the Defendant does appear to take issue with the identification procedures relied upon by law enforcement, Mot. 2–3; 10–11, this challenge is misplaced. That's because, contrary to Defendant's argument, this is not a situation where the Witness did not previously know the Defendant. Instead, as noted in the affidavit in support of the Warrant application, the Witness had known the Defendant "for several years" prior to the shooting, [ECF No. 48-3] at 21. The Witness simply confirmed to law enforcement, via social media and the DAVID photo, that it was the Defendant—a man the Witness already knew—who had perpetrated the shooting. Resp. at 3; [ECF No. 48-3] at 21. Thus, no lineup was necessary. And where, as here, law enforcement proceeds in good faith on the basis of an otherwise lawfully issued warrant to secure cell-site information of limited scope, the situation falls squarely within

the bounds of what the good faith exception is designed to protect. *See Taxacher,* 902 F.2d at 871. As a result, suppression would serve no deterrent purpose here and is not warranted.

One final aspect of the parties' briefings can be summarily resolved before moving on to the Defendant's second suppression argument. The Government dedicates two pages of its Response prospectively addressing a possible *Franks* challenge on the part of the Defendant. Resp. at 14–16. But at Calendar Call on October 3, 2023, [ECF No. 49], Defendant's counsel confirmed that he did not intend to raise a *Franks* challenge in his Motion. Accordingly, the Court need not address this aspect of the Government's Response.

## II. The Bag and its Contents

The Defendant next argues that the bag he was wearing at the time of his arrest was illegally searched because (1) he was arrested without probable cause or an arrest warrant; and (2) the Defendant neither consented to the search of his bag, nor did law enforcement have a warrant to search the bag. *See* Mot. 8–10. Therefore, Defendant argues, the bag and its contents must be suppressed as the fruits of a search incident to an illegal arrest. *See* Mot. at 4; 8–10. But for the reasons that follow, the Defendant's argument to suppress the bag's contents also fails.

The Supreme Court has long recognized "that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment." *United States v. Robinson*, 414 U.S. 218, 224 (1973). The Eleventh Circuit has interpreted *Robinson* to mean that "even absent probable cause or suspicion of danger, police can routinely search individuals and personal items the individuals have on them when they are arrested and seize anything probative of proving criminal conduct." *United States v. Ouedraogo*, 824 F. App'x 714, 720 (11th Cir. 2020). "The purpose for a search incident to arrest is to find weapons that the suspect may use to injure police officers and to collect and preserve evidence." *United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1222 (11th Cir. 1993). And in this Circuit, these principles have been applied to

containers that include backpacks and briefcases, *see United States v. Roper*, 681 F.2d 1354, 1357 (11th Cir. 1982), wallets, *see United States v. Watson*, 669 F.2d 1374, 1383–84 (11th Cir. 1982), and handbags, *see United States v. Rosenthal*, 793 F.2d 1214, 1232 (11th Cir. 2016). Indeed, the Eleventh Circuit has specifically applied the search incident to arrest doctrine where a gun is concealed in a backpack. *See, e.g., United States v. Jean*, 636 F. App'x 767, 769 (11th Cir. 2016).

Here, as correctly noted by the Government, Defendant's arrest on April 20, 2023 *was* made pursuant to a lawfully issued bench warrant. Resp. at 17. The arrest affidavit attached to the Government's Response, [ECF No. 48-2] at 1, reflects an outstanding bench warrant issued by the state court on April 12, 2023 for knowingly driving with a suspended license in Case Number AH2YRIE. *Id.*

Moreover, even if the Government lacked the aforementioned bench warrant, probable cause nonetheless existed at the time of Defendant's arrest on April 20. That's because by this time, law enforcement had the Witness's description identifying the April 12 shooter as the Defendant; information linking the Defendant to the Phone Number he used to call the Witness after the shooting; a description from the Victim circumstantially identifying the Defendant by his facial tattoo; and a surveillance video captured the night of the shooting depicting a man resembling the Defendant. Resp at 17. And although the Government's claim that the video shows a man "looking exactly like" the Defendant overstates the video's relative probity in light of its poor quality, probable cause to arrest nonetheless "deals with probabilities and depends on the totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). "[T]o determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Id.* at 371 (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). Here, based on the "totality of the circumstances,"

*Pringle*, 540 U.S at 371, there is no doubt that law enforcement had probable cause to arrest the Defendant given his connection to the shootings at issue and law enforcement's reasonable belief that he posed a continuing and serious threat to the community.

Ultimately, law enforcement's April 20, 2023 arrest of the Defendant was supported by both the existence of a valid bench warrant and probable cause. Accordingly, the Defendant was lawfully arrested, and the search of his bag incident to that arrest was also lawful. *Robinson*, 414 U.S. at 224. Defendant's suppression argument as to the bag's contents therefore fails.

### III. *No Need for a Suppression Hearing*

Finally, the Court addresses its decision forgo a suppression hearing before ruling on the instant Motion. At the outset, it bears mentioning that the Defendant did not request a suppression hearing. And "[a] district court is not required to hold an evidentiary hearing on a pretrial motion." *United States v. Horne*, 198 F. App'x 865, 869 (11th Cir. 2006). A district court also "may refuse a defendant's request for a suppression hearing . . . if the defendant fails to allege facts that, if proved, would require the grant of relief." *Id.* at 869–70.

Here, even if a hearing had been requested, the Court finds that the Defendant has failed to allege facts that, if proved, would require a grant of relief. Each of the suppression arguments the Defendant raises—whether the cell-site warrant was valid and whether the search of the bag was a lawful search incident to arrest—implicate questions of law, not fact. *See, e.g.*, *Horne*, 198 F. App'x at 870 (holding "the district court also did not abuse its discretion in not holding evidentiary hearings regarding whether the search warrant lacked probable cause and was overly broad and whether probable cause existed . . . [as these] motions presented issues of law, not fact."); *United States v. Allison,* 953 F.2d 1346, 1350 (11th Cir. 1992) (stating that the "question of what amounts to probable cause is purely a question of law"). Put simply, even if a suppression hearing had been

requested, there are no disputed facts at issue that, if proved, would require the Court to grant relief.

## CONCLUSION

In sum, law enforcement properly observed the Constitution's commands in this case by securing a valid cell-site warrant to locate a suspect believed to pose a continuing threat to the community and proceeding to conduct a lawful search incident to the arrest of that suspect. Thus, it is hereby

**ORDERED AND ADJUDGED** that Defendant's Motion to Suppress Phone Records and Physical Evidence, [ECF No. 40], is **DENIED**.

**DONE AND ORDERED** in Miami, Florida, this 9th day of October, 2023.

_____
**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**